# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

### No. ACM 40017

_____

### UNITED STATES
*Appellee*

**v.**

### Jesse J. MASSEY
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 30 January 2023

_____

*Military Judge:* Matthew D. Talcott (pretrial motion);[1] Mark W. Milam (arraignment); Willie J. Babor; Charles E. Wiedie, Jr. (*DuBay* hearing).

*Sentence:* Sentence adjudged 6 October 2020 by GCM convened at Royal Air Force Lakenheath, United Kingdom. Sentence entered by military judge on 24 November 2020: Dishonorable discharge, confinement for 18 months, and reduction to E-1.

*For Appellant:* Major David L. Bosner, USAF; Jonathan W. Crisp, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge GRUEN joined.

_____

---

[1] Pursuant to Article 30a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 830a.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Senior Judge:

Contrary to his pleas, a general court-martial composed of a military judge sitting alone convicted Appellant of wrongfully soliciting: the rape of a child, the production of child pornography, and the distribution of child pornography, all in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.[2] Appellant was sentenced to a dishonorable discharge, confinement for 18 months, and reduction to the grade of E-1. The convening authority approved the sentence in its entirety.

Appellant raises four assignments of error on appeal: (1) whether the evidence is legally and factually sufficient to support his convictions; (2) whether the military judge abused his discretion by finding a witness unavailable and permitting the admission of her deposition into evidence; (3) whether the military judge abused his discretion in concluding the charges were not unreasonably multiplied; and (4) whether Appellant's counsel were ineffective. We also consider the issue of timely post-trial processing and appellate review. We will consolidate Appellant's offenses into a single specification, dismiss the remaining two specifications, and reassess his sentence. Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings as modified and the sentence as reassessed.

## I. BACKGROUND

Appellant met Ms. MN in 2015 via an online dating application. They were both in high school at the time, with Appellant living in Florida and Ms. MN in Ohio. They began an online, long-distance dating relationship, communicating through various Internet platforms as well as by video and telephone calls. About six months after Appellant and Ms. MN started dating, their relationship became sexual in nature. During this relationship, Appellant and Ms. MN fantasized about a variety of subjects. Some subjects were fairly unremarkable, such as marriage, while others were more extreme, such as incest, suicide, and sexual contact with children. Because Ms. MN refused to travel to the United Kingdom for Appellant's court-martial, she was deposed two

_____

[2] All references in this opinion to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

months before the trial, in August 2020. The deposition was the first time Ms. MN and Appellant saw each other in person.

Appellant enlisted in the Air Force in early 2017 and reported to Royal Air Force (RAF) Lakenheath, United Kingdom, in September of that year. Once he was there, his relationship with Ms. MN began to cool, in part due to the time difference, as Ms. MN had moved to California. The relationship ended later that same year. According to Ms. MN, they "didn't officially break up. [They] just stopped talking." Shortly thereafter, Ms. MN became pregnant by another man, and she gave birth to a son, RN, in late May 2018. Meanwhile, Appellant and Ms. BM—a local British woman—were engaged to be married. Ms. MN and the father of her son likewise became engaged.

Although they were no longer dating, Appellant and Ms. MN communicated with each other periodically, and Appellant told Ms. MN about his engagement in June 2018 via a messaging function on the social media platform Instagram.

On 23 July 2018, Appellant contacted Ms. MN through Facebook Messenger, and they exchanged the following messages:[3]

> Appellant: Hey
>
> Ms. MN: Hi[.] Srry I'm not on [Facebook] much anymore
>
> Appellant: I miss u
>
> Ms. MN: U are getting married

The next day, the two exchanged these messages:

> Appellant: I still.want a pic of your kid with his penis in your mouth
>
> Ms. MN: No
>
> Appellant: Why
>
> Ms. MN: We are not together so im not sending u s[**]t[.] Go talk to your fiance about that
>
> Appellant: Not even as a one last thing? I don't want be an enemy
>
> Ms. MN: Ur not an enemy but we both are taken

---

[3] Unless otherwise indicated, we quote the messages between Appellant and Ms. MN verbatim.

Ms. MN married her fiancé in late August 2018, while she and Appellant continued to communicate with each other. On 1 September 2018, via Instagram, Appellant asked Ms. MN if she would "cheat" on her husband, and Ms. MN responded that she would not. Ten days later, the two had another Instagram conversation in which Appellant said that he was sorry things did not work out between him and Ms. MN but that he was happy with his fiancée. Ms. MN, on the other hand, said she was not sorry because she would have had to wait to have her son had she stayed with Appellant. She also told Appellant she was more in love with her son than she ever had been with him, although she told him she was "not saying [that] to be mean." Appellant married his fiancée in late September 2018.

In October 2018, again via Instagram, Ms. MN confided in Appellant that she was frustrated with her husband's apparent lack of interest in helping raise their child. She sent Appellant a photograph of her son, nearly five months old at that point, and Appellant responded, "Aweee[,] cute baby." Later in the month, the two discussed how Ms. MN had seen pictures of Appellant's wedding, which she described as "[b]eautiful," commenting that she had "never seen [Appellant] so happy." Appellant also told Ms. MN about how he and his wife might try to have a child the next year.

In the middle of November 2018, Appellant contacted Ms. MN via Instagram and asked, "Hey do you still like me like me?" After some back and forth, Ms. MN responded, "Always have . . . ." On 31 December 2018, Ms. MN reached back out to Appellant who responded the following day with, "What u doing?" Ms. MN replied, "Thinking of u." Appellant asked why, and Ms. MN said she did not "have s[o]me one special." Appellant then asked Ms. MN, "are you wanting to enjoy each other 1 more time" and if she was "horny." Ms. MN's response was, "No. Guess you are." Appellant replied, "Kinda, do you want to?" Ms. MN answered, "No," Appellant wrote back "Ok," and the conversation ended. Ms. MN testified during her deposition that Appellant's comment about enjoying each other was "a way of him asking [her] if [she] wanted to be sexual with him" via video chat.

On 12 January 2019, Appellant again contacted Ms. MN through Instagram, telling her that he was going to be deployed, and that, "It's very dangerous and if anything happens to me id like to do it with u one last time." Ms. MN replied, "Nope" and reminded Appellant that he was married. Appellant asked, "You won't consider it?" Ms. MN again answered, "Nope." She then told Appellant that he did not love her and was only interested in her for sex. Appellant wrote, "Come on," and Ms. MN replied, "No."

Two days later, Ms. MN reached out to Appellant's wife, Ms. BM, through Facebook Messenger to tell Ms. BM about Appellant's conduct.[4] In her testimony, Ms. MN explained: "I felt like he was cheating on her by asking me for those questions—those pictures and certain questions, and I felt like it was my job to inform her, hey, this is what your fiancé, husband is doing." Ms. MN sent Ms. BM screenshots of the 1 January 2019 "1 more time" exchange, the 12 January 2019 exchange in which Appellant said he was going to be deployed, and the July 2018 Messenger conversation asking for the picture of Ms. MN with her son. During the conversation that ensued, Ms. MN explained that Appellant had cheated on her while they were dating, and that she felt Appellant was doing the same to Ms. BM. Regarding the picture Appellant asked for on 24 July 2018, Ms. BM asked Ms. MN, "just to clarify[,] what did he mean by I still want a pick of your kid with his penis in your mouth[?]" Ms. MN replied, "he's asked for stuff like that before." Ms. BM asked, "Did you do it?" Ms. MN answered, "[n]ever" and added, "He wants to f[**]k his kids." Ms. BM later informed Ms. MN that she had confronted Appellant and that "he confessed to it after about an hour of denial."

Ms. BM told her sister, Ms. KE, about her conversations with Ms. MN and sent Ms. KE the screenshots she received from Ms. MN. Ms. KE, in turn, shared those messages with her then-boyfriend, an active-duty Airman in the United States Air Force. He reported this information to law enforcement, leading to an investigation by the Air Force Office of Special Investigations (AFOSI). Agents assigned to the case sought the assistance of a sheriff's office in California to interview Ms. MN, and on 1 March 2019, a police officer from that office went to Ms. MN's home unannounced. In the interview which followed, Ms. MN told the officer about her relationship with Appellant and allowed the officer to look through her phone for messages.

Two of Appellant's cell phones were seized and analyzed as part of AFOSI's investigation, and agents obtained a warrant for Appellant's Facebook and Instagram records. Neither the analysis of the phones nor the records obtained from Facebook disclosed any evidence of Facebook messages between Appellant and Ms. MN.[5] A forensic analyst testifying on the Government's behalf concluded it was "highly likely" Appellant had deleted the messages, which would explain why they did not appear in the Facebook records.[6] Records obtained from Instagram, however, did disclose the messages between the two

---

[4] Ms. MN said she learned Ms. BM's identity from information on Appellant's Facebook page.

[5] The warrant covered data from the period of 1 January 2018 through June 2019.

[6] The analyst did determine Appellant had used one of his phones to perform a search for Ms. MN on Facebook on 14 January 2019.

referenced above. According to AFOSI agents, the analysis of the phones did not reveal any evidence of child pornography or any interest on Appellant's part in such material.

Based upon his 24 July 2018 exchange with Ms. MN, Appellant was charged in January 2020 with soliciting Ms. MN to sexually assault her son as well as to produce and distribute child pornography. Ms. MN was deposed eight months later. In this deposition, Ms. MN explained that Appellant had repeatedly talked about his fantasy of marrying Ms. MN, having children with her, as well as the two of them having sex with each other and their children. She testified that Appellant started mentioning sexual conduct with children "[a]lmost right away" once their relationship turned sexual—comments which Ms. MN said made her feel "uncomfortable." At the time, she perceived these to be unreal fantasies, but once she had had an actual son and Appellant asked for an explicit picture of that son, Ms. MN believed Appellant was making a serious request. According to Ms. MN's testimony at her deposition, Appellant repeated his interest in sexual activity involving her son until RN was approximately nine months old, which would have been up to the time of her interview with the police officer. When asked why she refused to send Appellant a picture, she answered, "Because I was not okay with sending sexual pictures of my children."

Ms. MN told the police officer who interviewed her at her house that she only listened to—and did not actively participate in—Appellant's fantasies of sexual conduct with children. She admitted in her deposition that this was not true, as she had participated in those fantasies with Appellant and had even initiated such conversations on occasion. Ms. MN said she had lied to the officer because she did not want to get in trouble.[7] Ms. MN testified she never alerted law enforcement about Appellant's requests, saying: "I didn't know I was allowed to since he was overseas and he had never physically touched my child." She conceded that she approached Ms. BM not because she believed she was being asked to commit a crime, but because she believed Ms. BM should know what Appellant was doing behind her back.

Ms. MN testified she told the police officer that Appellant was "a sweet guy"—an opinion she continued to hold even at the time of her deposition. She further explained she did not have copies of any messages between her and Appellant other than the three exchanges she sent to Ms. BM. She said this was due to her habitual practice of deleting electronic conversations. Ms. MN said she sent screenshots of Appellant's messages to Ms. BM to prove she

---

[7] Copies of messages between Ms. MN and Ms. BN admitted at Appellant's court-martial revealed that Ms. MN also attempted to minimize her role in the child-sex fantasies when Ms. BN asked about the topic.

"wasn't lying" and that she "had something to back up what [she] was telling [Ms. BM]."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

On appeal, Appellant argues his convictions are legally and factually insufficient under three primary theories. First, he argues that Ms. MN was not subject to the UCMJ and she therefore could not be solicited "to commit a certain offense under the code." Second, he contends the Government failed to prove the picture he requested did not already exist at the time he asked for it. Under this second theory—and assuming the picture predated Appellant's request—Appellant argues he could not solicit the commission of rape of a child or production of child pornography, since those offenses would have already been committed prior to his request. Third, Appellant argues the evidence is insufficient to prove his conduct was service discrediting.

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "the standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration, internal quotation marks, and citation omitted).

The test for factual sufficiency is whether we, ourselves, are convinced of Appellant's guilt beyond a reasonable doubt "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the

evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). "[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted).

Appellant's convictions for solicitation in violation of Article 134, UCMJ, as charged here, required the military judge to find the following elements beyond a reasonable doubt: (1) that Appellant solicited Ms. MN to commit a certain offense under the code, (2) that Appellant did so with the intent that the offense actually be committed; and (3) that, under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 105.b.

At the time of Appellant's offenses, the UCMJ included two different solicitation offenses—solicitation under Article 134, UCMJ, as Appellant was charged, and solicitation under Article 82, UCMJ, 10 U.S.C. § 882, which pertained only to desertion, mutiny, sedition, and misbehavior before the enemy. The 2016 *MCM*'s discussion of the Article 134 offense points to the Article 82 offense for the explanation that the offense of solicitation occurs "when a solicitation is made . . . with the specific wrongful intent to influence another" to commit an offense. *See* 2016 *MCM*, pt. IV, ¶ 6.c.(1). The person solicited need not "agree to or act upon the solicitation." *Id.*

The United States Court of Appeals for the Armed Forces (CAAF) has described the Article 134, UCMJ, solicitation offense as "an express or 'implicit invitation to join a criminal plan.'" *United States v. Williams*, 52 M.J. 218, 220 (C.A.A.F. 2000) (quoting *United States v. Oakley,* 23 C.M.R. 197, 199 (C.M.A. 1957)). The invitation must amount to a "serious request." *See* 2016 *MCM*, pt. IV, ¶ 6.c.(2) ("Any act or conduct which reasonably may be construed as a serious request" to commit an offense "may constitute solicitation"). The offense of solicitation may occur even when the person being solicited is predisposed to commit the requested offense. *Id.* at 163. The crime of solicitation does not occur, however, when the solicited acts would not be criminal "under the circumstances as believed by the party solicited." *United States v. Higgins*, 40 M.J. 67, 68 (C.M.A. 1994) (quoting 2 Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 6.1 at 15 n.109 (1986)).

#### 2. Analysis

##### a. Solicitation of a Civilian

Appellant focuses on the requirement that the Government must prove Ms. MN was solicited to commit an offense "under the code." He theorizes that because she falls outside the UCMJ's court-martial jurisdiction, it was impossible

for her to commit an offense under the code. He argues that had Congress intended to criminalize the solicitation of civilians, the UCMJ would refer to committing offenses under federal and state law, not just "under the code."

In support of this argument, Appellant points to the dissenting opinion in *United States v. Simpson*, 81 M.J. 33 (C.A.A.F. 2021), *cert. denied,* 142 S. Ct. 237 (2021). In that case, the appellant had encouraged a woman to make surreptitious videos of her adult daughter and then send those videos to the appellant. *See United States v. Simpson*, No. 201800268, 2020 CCA LEXIS 67, at *3–4 (N.M. Ct. Crim. App. 11 Mar. 2020) (unpub. op.), *aff'd*, 81 M.J. 33 (C.A.A.F. 2021). The appellant was charged with and pleaded guilty to, *inter alia*, aiding and abetting the distribution of an indecent visual recording. On appeal, he argued his convictions were legally insufficient because the woman he solicited was not subject to the UCMJ, and her conduct had not violated any state or federal law she was subject to. *Simpson*, 81 M.J. at 37. The CAAF declined to address the argument due to it falling outside of the scope of the issues granted for review. *Id.* Chief Judge Stucky dissented, concluding the appellant could not be liable as an aider and abettor in the absence of evidence that the woman performed a criminal act. *Id.* at 38 (Stucky, C.J., concurring in part and dissenting in part). He reached this conclusion because the appellant had been charged under the first clause of Article 77, UCMJ, which subjects a person who is punishable under the UCMJ to criminal liability if that person "commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission." *Id.* Because there was no evidence the woman committed a crime by photographing her daughter (albeit without her daughter's consent) and sending that picture to the appellant, Chief Judge Stucky concluded the first clause of Article 77, UCMJ, did not apply. *Id.* He wrote,

> For an accused to be guilty as an aider and abettor, under the plain language of the first clause, someone must have committed a criminal offense. In [the a]ppellant's case, [the woman] was not subject to the UCMJ and neither the Government nor the majority have alleged that she committed any crime.

*Id.* He noted, however, that he thought the appellant *would* be guilty under the second clause, which covers a servicemember who "causes an act to be done which if directly performed by him would be punishable by this chapter." *Id.*

We are not persuaded the dissent in *Simpson* precludes Appellant's solicitation convictions. For one, the dissent is merely one judge's perspective on an issue the majority declined to address. Second, while the surreptitious recording of an adult daughter and the subsequent distribution of that recording by a civilian might conceptually not amount to a crime outside of the military,

there is no credible analogy to the offenses charged here: rape of a child, production of child pornography, and distribution of child pornography.[8] Third, Chief Judge Stucky's argument was premised on the fact Article 77, UCMJ, offers two different ways to prove the offense, and the Government in *Simpson*, in his view, chose the wrong one. He surmised the appellant's guilty finding would be valid had he been charged under the second clause for causing the woman to send the appellant the recording. *Id.* Much as that second clause covers a servicemember who causes another to commit an offense, solicitation under the UCMJ addresses servicemembers asking others to commit criminal conduct. We see no support for Appellant's theory that Ms. MN must have been subject to the UCMJ in order to support criminal liability on Appellant's part, and our assessment is bolstered by the fact that one may be convicted as a principal under Article 77, UCMJ, even if the perpetrator of the offense is not identified at all. *See* 2016 *MCM*, pt. IV, ¶ 1.b.(6). Indeed, we have found solicitation convictions to be valid when the person being solicited is not even real. *See United States v. Knarr*, 80 M.J. 522, 530–31 (A.F. Ct. Crim. App. 2020), *rev. denied*, 80 M.J. 348 (C.A.A.F. 2020) (the appellant solicited an undercover agent—whom he believed was a 14-year-old girl—for nude pictures). As we have concluded in other cases, the question is whether the solicited offense would be punishable under the UCMJ if committed by someone subject to the UCMJ, and not whether the solicited person him- or herself is in fact subject to the UCMJ. *See, e.g.*, *United States v. Heppermann*, 82 M.J. 794, 799 (A.F. Ct. Crim. App. 2022), *rev. denied*, __ M.J. __, No. 23-0017, 2022 CAAF LEXIS 839 (C.A.A.F. 22 Nov. 2022). We will not disturb Appellant's convictions under the argument he has advanced.

### b. Whether the Picture Existed or Not

Appellant contends the Government failed to prove the picture he requested did not already exist at the time he asked for it. Under this theory—and assuming the picture's creation predated Appellant's request—Appellant could not solicit either the rape of Ms. MN's child or the production of child pornography, since those offenses would have already been committed prior to his request. In support of this theory, Appellant points to Ms. MN's explanation for why she said no to his request: "Because I was not okay with sending sexual pictures of my children." Focusing on the word "sending" and noting the absence of any objection from Ms. MN as to the suggestion she assaulted her child or photographed the assault, Appellant argues there is a reasonable inference that the photograph already existed, and Ms. MN simply objected to sending it to him. Appellant suggests Ms. MN's earlier conversations with him about

---

[8] Chief Judge Stucky does not argue the woman in *Simpson* did not actually commit a crime, but rather that the Government did not allege she had.

incestuous fantasies demonstrate her predisposition to produce such a photograph.

Notably, Appellant did not pursue this theory at trial. Instead, his trial defense counsel argued that Ms. MN and Appellant were simply immature and that Appellant's request for the picture was not a serious request, and Ms. MN did not perceive the request to be serious. The Defense argued Ms. MN contacted Ms. BM because Ms. MN was obsessed with Appellant, and that Ms. MN only claimed Appellant's request seemed serious once a police officer showed up at her house.

In his brief to this court, Appellant frames his theory thusly: "There is no evidence to suggest the photograph depicting the sexual act did not already exist prior to the text message being sent." A significant obstacle for Appellant, however, is that there is no evidence such a photograph *did* exist. For the first time on appeal, Appellant contends the Government failed to disprove the possible existence of the photograph. We construe this argument as Appellant claiming there is a reasonable doubt as to his guilt.

Whatever may be said about Ms. MN's participation in fantasies with Appellant about sexual conduct with children prior to the birth of her son, there is no evidence Ms. MN engaged in such fantasies after her son was born. The evidence adduced at trial shows that Ms. MN flatly rejected Appellant's written request for a picture—a request that Ms. MN testified was in addition to other requests by Appellant that she engage in sexual contact with her son. The evidence also demonstrates Ms. MN refused to participate in any other sexual activity with Appellant, despite his requests. When Ms. BM asked Ms. MN if she took the requested picture, Ms. MN replied, "never." Moreover, when Appellant made his request, RN was only two months old, so for his theory to be valid, Ms. MN would have had to have assaulted her son—and photographed the assault—within weeks of his birth. A reasonable inference from all the evidence is that no such picture existed at the time of Appellant's request, and we are required to draw that inference in favor of the Government. *Barner*, 56 M.J. at 134. We decline to infer the opposite, and we will not find Appellant's convictions legally insufficient on this ground.

Having considered the evidence ourselves, we are unconvinced this theory undermines Appellant's convictions from a factual sufficiency standpoint. We find Appellant's own words telling, where he asks for "a pic" from Ms. MN. There is nothing to suggest Appellant believed such a picture actually existed or even that he thought a picture might exist. Similarly, nothing in Ms. MN's responses suggests she was withholding some existing picture from Appellant. We perceive Ms. MN's reaction to Appellant's entreaties—both for a picture and for sexual conduct with Ms. MN—to amount to flat rejections, if not outright hostility. Had Appellant raised this theory at trial, he might have been

able to develop more evidence on this point, but he did not. Based upon the record before us, Appellant has not raised a reasonable doubt with this new theory.

### c. Whether the Government Proved Service Discrediting Conduct

The Government charged each of the three offenses in this case under Article 134, UCMJ, as being "of a nature to bring discredit upon the armed forces." During the Government's case in chief, Ms. BM's sister, Ms. KE, testified that Appellant's conduct was not "something [she] expected from someone in the U.S. military[.]" On cross-examination, Ms. BM—who worked for the Air Force as a civilian employee—agreed that she had a good opinion of the Air Force. Then on re-direct examination, trial counsel asked her if Appellant's conduct caused her to "think differently of uniform wearers." She answered, "No. Not specifically, no."[9] No other witness was asked for his or her opinion as to whether Appellant's conduct might have been service discrediting. The Defense made a motion for a finding of not guilty for all three specifications under Rule for Courts-Martial (R.C.M.) 917 based upon the Government's purported inability to prove the terminal service-discrediting element. The military judge declared that the Government had "failed miserably" at presenting evidence on the element, but that "it's not required," since he could "consider the totality of the offenses in reaching such a decision." The military judge denied the motion, citing *United States v. Phillips*, 70 M.J. 161 (C.A.A.F. 2011), for the proposition that "proof of [the] conduct itself may be sufficient" to support a conclusion that the conduct was service discrediting. On appeal, Appellant agues his convictions are legally and factually insufficient under the theory the Government failed to prove the terminal element for each specification and that *Phillips* is distinguishable from his case.[10]

The *Manual for Courts-Martial* explains that service-discrediting conduct is that "which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." *See* 2016 *MCM*, pt. IV, ¶ 60.c.(3). In *Phillips*, the appellant was caught in possession of child pornography during a search of his room by law enforcement looking for evidence pertaining to an unrelated larceny offense. 70 M.J. at 163–64. No one testified that Appellant's conduct was service discrediting or that anyone other than the agents searching his room was even aware of his conduct. *Id.* at 164. The CAAF explained that the Government is required to prove every element of an offense beyond a reasonable

---

[9] Trial counsel attempted to ask her additional questions on this point, but the military judge sustained the Defense's objection to any further questions.

[10] Appellant also asserts *Phillips* was wrongly decided. We do not address this contention.

doubt and that it is improper to find the commission of an offense to be conclusively service discrediting. *Id.* at 165. The court, however, rejected the notion that a conviction under a service-discrediting theory requires proof of the public's knowledge of an accused's conduct. *Id.* Instead, the CAAF concluded: "The trier of fact must determine . . . beyond a reasonable doubt that [the] conduct would tend to bring the service into disrepute if it were known." *Id.* at 166 (citation omitted). The CAAF explained that the Government need not prove anyone was aware of an accused's conduct or "to specifically articulate how the conduct is service discrediting." *Id.* Instead, the Government must "introduce sufficient evidence of the accused's allegedly service discrediting conduct to support a conviction." *Id.* The CAAF concluded a rational trier of fact could have found the appellant's possession of child pornography to be service discrediting "had the public known of it." *Id.* Four years after *Phillips* was decided, the CAAF reiterated that proof of the charged conduct "*may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces." *United States v. Norman*, 74 M.J. 144, 146 (C.A.A.F. 2015) (quoting *Phillips*, 70 M.J. at 163).

Appellant seeks to distinguish his case from *Phillips* by arguing that the Government in *Phillips* offered no evidence on the terminal element, whereas the Government in his case "tried, but failed" to elicit such evidence. He argues this distinction prohibits a factfinder from finding that his conduct was service discrediting because the evidence actually elicited on this point showed his conduct was *not* service discrediting—at least in the mind of the one witness who was asked about it.

While the Government's effort to obtain testimonial evidence through Ms. BM's sister on the service-discrediting element generally fell flat, we are not persuaded that the Government failed to prove the element. Appellant was charged with soliciting the commission of three serious offenses: rape of a child, production of child pornography, and distribution of child pornography. At the time, Ms. MN's son was just two months old. Moreover, Appellant used the Internet to transmit his request from the United Kingdom halfway around the world and across international borders. The offenses at issue here are the sort that have garnered near universal opprobrium, in no small part because not only do they victimize some of the most defenseless victims, but they create a near-permanent and often widely distributed record of that victimization. Ms. BM's sister's opinion does not operate to contradict or minimize the service-discrediting nature of Appellant's conduct—her opinion merely reflects the

opinion of one person.[11] We decline to adopt Appellant's argument to the contrary. Considering our deferential review of the legal sufficiency of convictions, we conclude a rational trier of fact could have found Appellant's conduct service discrediting. Having reviewed the evidence ourselves, we are also convinced of Appellant's guilt beyond a reasonable doubt.[12]

## B. Admission of Ms. MN's Deposition

At Appellant's court-martial, the military judge found Ms. MN to be unavailable and permitted the admission of her deposition over the Defense's objection. Appellant contends on appeal that the military judge abused his discretion in finding her unavailable, a finding which authorized the deposition's admission.

### 1. Additional Background

In January 2020, the Government contacted Ms. MN, who was living in California, in an effort to secure her appearance at trial. On 7 January 2020, Ms. MN sent an email to trial counsel which read in its entirety: "I talked it over with my husband and we don't think it will be a good fit for us, having me alway [sic] for so long. I would love to help any way I can going forward. Thank you for everything." The Government attempted to persuade Ms. MN to change her mind, but Ms. MN persisted in refusing to travel to the United Kingdom for the trial, even though her expenses would have been paid for by the Government. She further frustrated Government efforts to secure her presence by refusing to provide the passport information needed to arrange her international travel. The convening authority then ordered the oral deposition which took place on 11 August 2020 at Travis Air Force Base, California; Appellant, his counsel, and his expert consultant in forensic psychology were present for the video-recorded proceeding. Although Ms. MN agreed to the deposition, she told the parties she still had no intention of participating in Appellant's court-

---

[11] We recently reached the same conclusion in a case wherein a witness who was asked about the appellant's conduct said the conduct did not make her respect the military any less. *Heppermann*, 82 M.J. at 801–02.

[12] We note trial counsel's closing argument only briefly touched on the service discrediting element. Trial counsel argued, "Your Honor, of course asking someone to rape their [two]-month-old child, take a photo of it and then send it to them is service discrediting, especially with this level of persistence." Trial counsel did not mention the element again. We agree with the CAAF that "the better practice would be for trial counsel to make its theory of discredit apparent during closing arguments." *United States v. Norman*, 74 M.J. 144, 153 n.5 (C.A.A.F. 2015).

martial at RAF Lakenheath, a position she maintained through the Government's last contact with her about the matter on 10 September 2020.[13]

At trial, the Government made a motion to admit Ms. MN's deposition in lieu of her in-person testimony. The Defense objected and asked the military judge to abate the proceedings. Alternatively, the Defense asked that the "entirety of the Defense cross-examination" be admitted.[14] The military judge granted the Government's motion, finding Ms. MN to be unavailable within the meaning of Mil. R. Evid. 804(a). He based this conclusion on the fact that he had no authority to compel civilian witnesses to travel outside the United States and that Ms. MN had steadfastly refused to voluntarily travel. He also concluded the Government had made good faith efforts to obtain her in-person appearance. He further ruled that because the deposition was recorded and transcribed verbatim, Ms. MN's prior testimony was "undoubtedly reliable and [met] the criteria contemplated in [Mil. R. Evid.] 804(b)." The military judge also noted that Appellant, his counsel, and expert were present, and that the Defense cross-examined Ms. MN "for over an hour on the full scope of relevant topics."

Appellant argues the military judge abused his discretion in finding Ms. MN "unavailable" under the theory that Ms. MN was willing to participate live at Appellant's court-martial, just not travel to the United Kingdom.

**2. Law**

When a witness's testimony on a matter in issue on the merits would be relevant and necessary, a party is entitled to the production of that witness. R.C.M. 703(b). The presence of civilian witnesses may be obtained by subpoena, but a subpoena "may not be used to compel a civilian to travel outside the United States and its territories." R.C.M. 703(g)(3) and 703(g)(3)(A), Discussion; *see also United States v. Bennett*, 12 M.J. 463, 471 (C.M.A. 1982) (a court order requiring a person to travel to a foreign country is "a nullity").[15]

The Rules for Courts-Martial permit depositions to be ordered when "it is in the interest of justice that the testimony of a prospective witness be taken and preserved for use at trial." R.C.M. 702(a)(1). When a deponent is found to be unavailable to testify as a witness at trial, the deposition may be admitted

---

[13] The record does not disclose Ms. MN's reasons for not wanting to travel.

[14] During the deposition, trial counsel lodged a number of objections, which the military judge characterized as "excessive interruption[s]." The military judge ultimately overruled all of them, leading to the entirety of the deposition being admitted.

[15] Under R.C.M. 703(b)(1), a military judge may permit a witness to testify remotely with the consent of both parties. The record does not indicate whether this option was considered in the instant case.

under the former testimony hearsay exception when the party against which it is offered had the opportunity and similar motive to develop that testimony through examination. Mil. R. Evid. 804(b)(1). Under Mil. R. Evid. 804(a)(5), a witness is considered unavailable when absent from the proceedings and when the proponent of the witness's testimony "has not been able, by process or other reasonable means, to procure the declarant's attendance." Under Mil. R. Evid. 804(a)(6), a witness is similarly unavailable when he or she "has previously been deposed about the subject matter and is absent due to . . . non-amenability to process, or other reasonable cause." The requirement to prove a witness's unavailability is rooted in the Sixth Amendment's confrontation clause.[16] The question of unavailability is "whether the witness is not present in court in spite of good-faith efforts by the Government to locate and present the witness." *United States v. Cokeley*, 22 M.J. 225, 228 (C.M.A. 1986) (citing *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)).

We review a military judge's finding of unavailability along with "the antecedent question of the [G]overnment's good-faith efforts" for abuse of discretion. *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007) (citing *Cokeley*, 22 M.J. at 229)). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997) (additional citation omitted)).

### 3. Analysis

In his brief to this court, Appellant tacitly acknowledges the Government had no ability to use its subpoena power to force Ms. MN to travel to the United Kingdom in order to testify at Appellant's court-martial. This inability to compel Ms. MN's presence, in conjunction with her rejection of the Government's attempts to fly her to the United Kingdom, would seem to conclusively answer the question of whether she was "available" or not under either Mil. R. Evid. 801(a)(5) or 801(a)(6). Appellant, however, argues that Ms. MN *was* available to testify, just not at RAF Lakenheath. Thus, according to Appellant, the Government manufactured her unavailability by electing to conduct Appellant's

---

[16] U.S. CONST. amend. VI.

court-martial in the United Kingdom, as opposed to some place closer to Ms. MN's residence, and the military judge should have refused to find Ms. MN unavailable. Appellant cites no legal authority for this proposition, but notes the military judge "could have and probably should have" changed the court-martial's venue, despite the fact Appellant made no such request at the time of his trial. This argument—that a witness who is unwilling to travel overseas is nevertheless "available" because the court-martial could be moved a location more to that witness's liking—has been rejected by our superior court. *See United States v. Crockett*, 21 M.J. 423, 427 (C.M.A. 1986) ("Although courts-martial have greater mobility than do most civil courts, we are unpersuaded that a witness is 'available' under Mil. R. Evid. 804(a) because of a possibility that the court-martial could move to the witness'[s] residence in order to hear his testimony first hand.").

Appellant's construct would require courts-martial to relocate as needed to meet the wishes of recalcitrant witnesses. This would turn the concept of "un-availability" on its head, as the *Manual for Courts-Martial* plainly contemplates witnesses coming to courts-martial—and not the other way around—by virtue of R.C.M. 703 which explains in detail how to procure the presence of witnesses.[17] Here, the Government made good-faith efforts to travel Ms. MN to RAF Lakenheath, but she refused to go. Because of the international boundaries involved, she was not amenable to process, and both the Government and the military judge were powerless to compel her presence. We conclude the military judge did not abuse his discretion when he found Ms. MN unavailable and subsequently admitted her deposition.

## C. Unreasonable Multiplication of Charges

At trial, the Defense moved the military judge to merge the three specifications for findings purposes, arguing that the Government had unreasonably multiplied the charges. Appellant's argument was rooted in his assessment that all three specifications arose from "a single message." The Defense further asked the military judge to merge the specifications for sentencing purposes if he did not do so for findings. The military judge denied the motion, concluding the three charged acts were "sufficiently different in manner and each specification allege[d] a different crime" such that they described "distinctly separate criminal acts."[18] He concluded the three specifications did not misrepresent or

---

[17] We acknowledge the discussion under R.C.M. 906(b)(11) indicates a change of the place of trial may be necessary "to obtain compulsory process over an essential witness." We do not understand that statement to require a military judge to *sua sponte* order a change in venue, especially when the witness's testimony has been otherwise preserved through a deposition.

[18] The three acts were charged as Specifications 1–3 of the Charge.

exaggerate Appellant's criminality, as Appellant had effectively asked Ms. MN to do three separate things: sexually assault her son, take a photograph of the assault, and then send that photograph to Appellant. The military judge further determined that an increase in Appellant's potential sentence from 5 to 15 years of confinement was not "*per se* unreasonable," and that there was no evidence of prosecutorial overreach or abuse.

Once the military judge convicted Appellant of all three specifications, he told the parties that he would merge the offenses for sentencing purposes. He explained that while he did not think ten years of additional confinement was *per se* unreasonable, he found the additional ten years "in this sentencing context" to be unreasonable.

On appeal, Appellant argues the military judge abused his discretion by not dismissing two of the specifications, because the three specifications exaggerate and misrepresent Appellant's criminality insofar as they essentially spring entirely from a single message. Appellant asks us to dismiss with prejudice the specifications pertaining to the rape of a child and production of child pornography as relief.

We review a military judge's denial of relief for claims of unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citations omitted). As explained in R.C.M. 307(c)(4), "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The underlying concept here is that the Government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994), *overruled in part on other grounds by United States v. Miller*, 67 M.J. 385 (C.A.A.F. 2009). In assessing whether charges have been unreasonably multiplied, military judges consider the following non-exclusive factors:

> (1) whether each charge and specification is aimed at distinctly separate criminal acts,
>
> (2) whether the number of charges and specifications misrepresent or exaggerate the accused's criminality,
>
> (3) whether the number of charges and specifications unreasonably increase the accused's punitive exposure, or
>
> (4) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges.

*Campbell*, 71 M.J. at 24 (citing *United States v. Quiroz,* 55 M.J. 334, 338 (C.A.A.F. 2001). In *Campbell*, the appellant—a nurse manager—had obtained prescription drugs from a pharmacy dispensing machine by inputting the names of patients for whom such drugs had not been prescribed. *Id.* at 20–21.

The appellant was charged with making false official statements (by inputting the patients' names), larceny (for stealing the drugs from the hospital), and possession of controlled substances (for taking possession of the drugs from the machine). *Id.* at 21. Similar to Appellant's case, the military judge in *Campbell* declined to merge the offenses for findings but did merge them for sentencing. *Id.* at 21–22. The CAAF found no abuse of discretion on the military judge's part because each specification "addresses a distinct criminal purpose" even though each transaction with the machine "represented a singular act." *Id.* at 24. The CAAF noted the appellant could have abandoned his efforts once the machine dispensed the drugs or otherwise avoided taking wrongful possession of them. *Id.* at 25. Because the appellant had taken drugs multiple times using the same scheme and was charged with committing his offenses "on divers occasions" rather than in multiple individual specifications, the CAAF concluded the Government's charging scheme arguably operated to reduce his criminality. *Id.*

In contrast to *Campbell*, Appellant's offenses were complete the moment he sent his message—he did not have the ability to commit just one of the offenses but abandon the others. Appellant's charges were drawn from the single message he sent on 24 July 2018, so there is no plausible argument the Government's charging scheme somehow reduced his criminality.[19] This case presents a close call. On one hand, the Government has distinct and legitimate reasons for criminalizing sexual assault of a child, production of child pornography, and distribution of child pornography as separate offenses. Each offense targets a particular way in which children may be victimized, each with the real potential for severe and long-lasting consequences. On the other hand, arriving at three separate convictions in this case requires a meticulous parsing of Appellant's singular statement: "I still want a pic of your kid with his penis in your mouth."

The gravamen of Appellant's statement is a stated desire for the picture. Implicit in any request for a picture is the notion that the picture either had already been taken or needed to be taken in order to fulfill the request. Similarly, expressing a desire for a picture not in one's possession implies the need for someone to transmit the picture to the person requesting it—that is, to distribute it to him or her. The Government argues Appellant asked Ms. MN to do three separate things, suggesting Appellant's request was analogous to another accused saying, "I want you to kill Airman Snuffy, steal his car, and bury

_____

[19] Ostensibly, Appellant made a second request when he asked, "Not even as one last thing?" in response to Ms. MN saying she would not send him the picture. We, however, view this question as an extension of his initial request.

his body in the desert to hide all of the evidence" (reaching solicitation of murder, larceny, and obstruction). The Government's chosen example somewhat illustrates the issue at hand, because Appellant did not make such an explicit tripartite request. A more apt analogy would be to a servicemember stating, "I want some cocaine from you," and then being charged with soliciting the acquisition, possession, and distribution of the drug.

Given the fact Appellant's misconduct is rooted in a request that Ms. MN provide him a picture which would amount to a recording of the sexual abuse of a child, and the only way such a picture could be created would be by committing the sexual abuse itself, there is a logical—if weak—argument the specifications are aimed at distinctly separate criminal acts. Splintering out Appellant's offenses in the manner done here portrays Appellant as not just interested in obtaining child pornography but willing to solicit another to rape a child and photograph herself while doing so. Arguably, that is exactly what Appellant did, especially considering the fact he had previously expressed interest in Ms. MN performing other sexual acts upon then-nonexistent children. The military judge's decision to merge the specifications for sentencing purposes renders the question of Appellant's punitive exposure moot, and there is no obvious evidence of prosecutorial overreach.

Based upon the absence of controlling precedent, we do not find the military judge abused his discretion. We are not persuaded, however, that allowing Appellant to stand convicted of three separate offenses is a just outcome. Appellant made a singular request to Ms. MN—that he wanted to see a picture of her son's penis in her mouth. He provided no further direction on how Ms. MN should produce the picture or how she was to deliver it to him.

Solicitation, like conspiracy, is an inchoate offense, and the essence of the offense is the request itself. *See, e.g.*, *United States v. Bayer*, 331 U.S. 532, 542 (1947) (conspiracy's "essence is in the agreement or confederation to commit a crime"); *United States v. Conway*, 40 M.J. 859, 862 (A.F.C.M.R. 1994) ("the essence of criminal solicitation [is] the invitation to participate in some wrongful act"). In the case of a conspiracy, "[a] single agreement to commit multiple offenses ordinarily constitutes a single conspiracy." *United States v. Pereira*, 53 M.J. 183, 184 (C.A.A.F. 2000) (per curiam) (citation omitted). "Whether the object of a single agreement is to 'commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes." *Id.* (quoting *Braverman v. United States*, 317 U.S. 49, 53 (1942)). In *Pereira*, the CAAF concluded three separate conspiracies (for murder, robbery, and kidnapping) should be consolidated into a single specification. Some of the factors used to determine whether there is a single conspiracy or multiple conspiracies look at the nature of the scheme in each alleged conspiracy, the overt acts alleged in each, the time and location of each, the participants, and the

interdependence between the conspiracies. *United States v. Finlayson*, 58 M.J. 824, 827 (A. Ct. Crim. App. 2003). There is little apparent reason why a singular request should be divisible by its component parts to multiply the number of charges against an accused in the case of solicitation when doing so would be impermissible had a conspiracy been instead alleged. This is especially true in the instant case where Appellant is charged with asking one person for one picture on one occasion. Pursuant to our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we will consolidate the three specifications into a single specification under the Charge as follows:

> In that AIRMAN FIRST CLASS JESSE J. MASSEY, 748th Aircraft Maintenance Squadron, Royal Air Force Lakenheath, United Kingdom, did, within the United Kingdom, on or about 24 July 2018, wrongfully solicit [Ms. MN] to: commit a sexual act upon [RN], a child who had not attained the age of 12 years, to wit: requesting she cause [RN's] penis to penetrate her mouth; produce child pornography, to wit: requesting she take a photograph of a minor, [RN], engaging in sexually explicit conduct; and to distribute child pornography, to wit: requesting she send a photograph of a minor, [RN], engaging in sexually explicit conduct, to AIRMAN FIRST CLASS JESSE J. MASSEY, and that said conduct was of a nature to bring discredit upon the armed forces.

Because the military judge merged these three offenses for purposes of sentencing, Appellant's sentencing landscape is unaffected by our consolidation, and we reassess his sentence to be the same as the sentence adjudged at his court-martial.

## D. Allegations of Ineffective Assistance of Counsel

### 1. Additional Background

At trial, Appellant was represented by his detailed military counsel, Major (Maj) MM,[20] along with Mr. GH, a civilian counsel. On appeal, Appellant asserts his trial defense counsel's performance was deficient in five different ways. Specifically, he alleges his counsel failed to: request the assistance of a forensic psychologist, move for a change of venue, challenge the specifications as multiplicious, and request specific findings under R.C.M. 918. Appellant also claims his counsel failed to allow him to present an unsworn statement to the military judge during presentencing proceedings. Based on Appellant's allegations, trial defense counsel submitted a joint declaration which we consider in addressing his claims. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F.

---

[20] Major MM was a captain at the time of Appellant's court-martial.

2020). After receiving this declaration, we ordered a post-trial evidentiary hearing to resolve factual disputes regarding Appellant's decision not to deliver an unsworn statement. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam).

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689). The burden is on the appellant to identify specific unreasonable errors made by his or her defense counsel. *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999) (citing *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego [sic] a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (first citing *Gooch*, 69 M.J. at 362–63; and then citing *United States v. Stephenson,* 33 M.J. 79, 80 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id*. (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) is there a reasonable explanation for counsel's actions; (2) did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel were ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362; *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted); *see also Akbar*, 74 M.J. at 386 (applying same standard for defense counsel's performance during sentencing proceedings). Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome,"

instead, it must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

### 3. Analysis

#### a. Expert Assistance

Appellant's first contention—that his counsel should have sought the assistance of a forensic psychologist—is grounded in the theory that such an expert could have helped the Defense understand and present information to the factfinder about sexual fantasies. The gist of Appellant's argument is that the expert would have enabled the Defense to demonstrate Appellant was merely engaging in fantasy when he asked Ms. MN for the picture, and that he had no intent to solicit the production of an actual picture. In their written joint declaration, however, trial defense counsel assert they not only requested the assistance of a forensic psychologist, but that request was granted and the Defense was able to make use of the expert's assistance. Specifically, the expert reviewed the evidence in the case, performed an evaluation of Appellant, attended Ms. MN's deposition, and was present for Appellant's court-martial. Appellant's affidavit does not contest these assertions—in fact, his affidavit is silent on the issue of expert assistance. Moreover, the military judge's findings of fact from the *DuBay* hearing explain, in part, that "[t]he [D]efense had intended to call their expert to discuss the impact of the sexual abuse on [ ] Appellant but decided not to call the expert to testify following further consultation after the trial counsel's interview of the expert." This finding is corroborated by the trial transcript which references the Defense's intention of calling an expert witness during presentencing proceedings—a witness whom the Government had not yet had the opportunity to interview. Thus, Appellant's contention his counsel did not obtain expert assistance in psychology is simply inaccurate.

To the extent Appellant's argument is that trial defense counsel were ineffective in not presenting expert testimony, we conclude that decision was not unreasonable—the Defense's expert could have potentially opened the door to harmful testimony gleaned from his analysis of Appellant and the evidence in his case. The issue of Appellant's and Ms. MN's fantasies was well-explored and we note the absence of any indication Appellant was fantasizing when he point-blank asked Ms. MN for a picture of her sexually assaulting her actual

son. The notion that subjecting this expert to cross-examination might be unhelpful in this case is far from unreasonable, and the decision not to present expert testimony is well within the strategic discretion of counsel. Appellant's claim on this point warrants no relief.

### b. Change of Venue

Appellant's second contention is that his counsel should have sought a change in venue in order to secure Ms. MN's live testimony at his court-martial. Appellant asserts that this would have preserved his confrontation rights and that Ms. MN's "testimony would have been easier for the factfinder to understand." In their joint affidavit, trial defense counsel explained they consciously elected not to seek a change of venue because they viewed the deposition as helpful to the Defense, and they did not want to give the Government the opportunity to rehabilitate Ms. MN on the stand.[21] We see nothing unreasonable about this strategic decision. Moreover, Appellant has entirely failed to explain how live testimony from Ms. MN would have led to a different result at trial. The Defense had the full opportunity to cross-examine Ms. MN during her deposition, and the military judge overruled every objection lodged by the Government during the deposition. Ms. MN admitted to lying to the police officer and destroying nearly all the evidence of her relationship with Appellant. She also conceded she alerted Appellant's wife to his conduct not because she believed Appellant was trying to commit a crime, but because she thought Appellant was being unfaithful. Permitting the Government to rehabilitate Ms. MN's testimony through further questioning quite possibly could have operated to further prejudice Appellant's defense. Such a calculation is best left in the hands of trial defense counsel. We do not diminish Appellant's valid confrontation rights, but Appellant has fallen short of undermining our confidence in the outcome of his trial based upon his counsel's decision not to pursue a motion for a change of venue.

### c. Multiplicity

Appellant's third contention is that his trial defense counsel should have objected to the specifications on grounds of multiplicity (in addition to the objection on unreasonable multiplication grounds, which the Defense did make). Based upon our consolidation of the specifications and the military judge's decision to merge the specifications for sentencing purposes, this issue is moot.

---

[21] This post-trial assertion is consistent with the Defense's approach at trial. While the Defense asked trial counsel to produce Ms. MN for trial, the Defense never sought an order from the military judge that she be produced. Instead, the Defense sought to have her deposition ruled inadmissible. Had that been successful, the Government's case would have been severely undermined in the face of Ms. MN's absence.

### d. Special Findings

Appellant's fourth contention is that his counsel should have requested special findings. Under R.C.M. 918(b), a military judge "shall make special findings upon request by any party" and such requests pertain to "matters of fact reasonably in issue as to an offense." The discussion to the rule explains "[s]pecial findings ordinarily include findings as to the elements of the offenses . . . and any affirmative defenses relating thereto." R.C.M. 918(b), Discussion. Appellant argues that without special findings, he has "lost the ability to ensure the law upon which the judge relied was proper." We decline to find Appellant's counsel deficient on this point. Appellant's case was neither factually nor legally complex, and Appellant has the full ability—which he has exercised—to challenge the factual and legal sufficiency of his convictions.

### e. Unsworn Statement

During the sentencing phase of Appellant's court-martial, Appellant did not provide an unsworn statement, either orally or in writing. The military judge specifically asked Appellant, "Was this your personal decision not to testify or provide even an unsworn statement?" Appellant responded, "Yes, sir."

On appeal, however, Appellant claims he had prepared an unsworn statement which he shared with his counsel, but that his counsel did not want him to read it. In his post-trial declaration, Appellant states that defense counsel "did not try and edit what I had written to make it better or different." Appellant asserts he "wanted to tell the judge in detail about the sexual abuse [he] suffered . . . [as] a child as well as the other things that happened to [him] when [he] was young," in addition to how much the Air Force means to him.

In their joint declaration, trial defense counsel assert they "did not prevent or fail to allow [Appellant] to make an unsworn, or sworn statement, during his trial," and that leading up to trial, Appellant "worked through several iterations of an unsworn, written statement that he could potentially read in open court." They state that after the military judge made his findings, they discussed the unsworn statement with Appellant, and Appellant decided he did not want to make a statement.

Due to the disagreement over the advice and degree of assistance provided by trial defense counsel, we ordered a post-trial evidentiary hearing, directing a military judge to return findings of fact related to the matter. The military judge presiding over that *DuBay* hearing determined Appellant had provided Maj MM with a draft unsworn statement more than four months prior to the court-martial and that the two had periodically discussed proposed modifications as trial grew closer. Appellant continued to edit his unsworn statement up until the last day of his court-martial, and Ms. BM testified at the *DuBay*

hearing that she had also helped Appellant with his unsworn statement which Appellant practiced reciting at home.[22]

As the *DuBay* judge explained in his findings of fact, Appellant reacted very emotionally after the verdict was announced, resulting in a short break to allow Appellant to regain his composure. After returning to the courtroom, the trial judge explained to Appellant his rights regarding either testifying or delivering an unsworn statement during the presentencing phase, rights which Appellant said he understood. The Defense proceeded to admit documentary evidence and then told the military judge Appellant would be submitting an unsworn statement. The military judge recessed the court-martial so that the Government could interview the Defense's expert psychologist, whom the Defense intended to call as a sentencing witness. During that recess, Appellant and Mr. GH went into a separate room and discussed Appellant's unsworn statement. Mr. GH told Appellant, *inter alia*, that if he delivered an unsworn statement, he should not complain about the verdict or apologize, as such could be seen as an admission of guilt which could adversely impact an appeal. Mr. GH and Appellant returned to the courtroom where they were joined by Maj MM. While Mr. GH did not explicitly tell Appellant not to deliver an unsworn statement, both Maj MM and Ms. BM independently formed the impression that Mr. GH did not think Appellant should do so. Maj MM testified that it was "more of a one-way conversation" between Mr. GH and Appellant and that "[t]here wasn't a lot of discussion." Appellant then indicated he would not deliver an unsworn statement. Mr. GH did not raise the possibility of submitting a written unsworn statement with Appellant, and Maj MM testified that "there [was] just no strong inclination on [his (Maj MM's)] part to jump in and disrupt" the conversation.

Shortly thereafter, Appellant's trial defense counsel decided not to call their expert as a witness and immediately rested when the court-martial was called to order. The military judge asked Appellant if it was his decision not to either testify or provide an unsworn statement, and Appellant answered in the affirmative. According to testimony at the *DuBay* hearing, neither Mr. GH nor Maj MM revisited the question of whether or not to present an unsworn statement after the decision was made not to call their expert witness. As a result, Appellant's sentencing case consisted of pictures of Appellant; a description of his decorations; a certificate of excellence; and letters from a friend, a noncommissioned officer in Appellant's unit, Appellant's half-brother, and a British counselor who provided services to adults who had suffered childhood sexual abuse. The counselor's letter explains that Appellant had disclosed he was abused when he was eight years old and that victims of such abuse will often

---

[22] By the time of the hearing, Appellant and Ms. BM had divorced.

"struggle to develop an understanding of what sort of sexual behaviour is acceptable and appropriate." The letter goes on to discuss Appellant's commitment to treatment and commends him for his "honesty, openness[,] and courage" in working with the counselor.

Various iterations of Appellant's written unsworn statement were marked as appellate exhibits at the *DuBay* hearing. The final version, which Appellant had provided the morning of the last day of his court-martial, begins with this line: "I would like to express my extreme regret and sincere apologies for my actions, and for putting myself in this situation." Appellant wrote that he wanted to apologize to his family and to "express the sincere disappointment" he felt in himself as well as "the shame [he] brought upon the Air Force." He continued, "I am truly sorry. I have nothing but regret in regards to my online social media activity and I wish I could undo the actions that have led me here today." The statement recounts Appellant's upbringing and decision to join the Air Force; it briefly mentions that Appellant was "sexually abused by a family member for some time" while a child, but does not elaborate any further on that topic. As for Appellant's relationship with Ms. MN, the statement indicates Ms. MN would discuss her sexual fantasies with Appellant and that Appellant would participate in those conversations, leading to Appellant "compromis[ing] both [his] morals and integrity for selfish gain." Appellant wrote that he took "full responsibility for [his] actions" leading to the charges, but that his "mistake" was an "isolated incident" which was not "indicative of [his] true character."

At the *DuBay* hearing, Mr. GH maintained that he did not know why Appellant decided not to deliver the unsworn statement, because Appellant never told him why. Mr. GH did acknowledge he told Appellant that talking about "being sexualized when he was younger" would not "land well" with "that particular judge." Mr. GH added, "I knew that particular judge." Mr. GH said his "guess" was that Appellant decided not to make the unsworn statement "because of his emotional state . . . because his wife was going to be in the room." Later in his testimony, Mr. GH said that he told Appellant that talking about his childhood abuse could "make the judge feel that [his] recidivism is actually far worse . . . that [he is] preconditioned to re-victimize because [he himself] was a victim."

The right of an accused to give an unsworn statement "has long been recognized by military custom." *United States v. Rosato*, 32 M.J. 93, 96 (C.M.A. 1991) (citation omitted). Our superior court has explained, "so long as this valuable right is granted by the *Manual for Courts-Martial*, we shall not allow it to be undercut or eroded." *United States v. Partyka*, 30 M.J. 242, 247 (C.M.A. 1990). "Military law is clear that the decision to make an unsworn statement is personal to the accused." *United States v. Marcum*, 60 M.J. 198, 209

(C.A.A.F. 2004). Trial defense counsel may not override an accused's wishes to present an unsworn statement based upon tactical trial decisions. *See, e.g.*, *United States v. Dobrava*, 64 M.J. 503, 506 (A. Ct. Crim. App. 2006) (concluding trial defense counsel's decision to forgo unsworn statement without accused's consent amounted to ineffective assistance of counsel). Similarly, trial defense counsel are expected to give their clients adequate advice so that they may determine how to craft and deliver an effective unsworn statement. *See, e.g.*, *United States v. Smith*, No. ACM S30169, 2005 CCA LEXIS 33, at *10–11 (A.F. Ct. Crim. App. 4 Jan. 2005) (unpub. op.) (finding counsel to be ineffective by virtue of giving "generalized" and "limited" advice on drafting an unsworn statement). If Appellant cannot demonstrate prejudice arising from his counsel's performance, we need not reach the question of whether that performance was deficient. *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001).

We find trial defense counsel's approach to Appellant's unsworn statement highly questionable. It appears that Mr. GH—the lead trial defense counsel in Appellant's case—did not give any significant attention to the matter until the presentencing proceedings were already underway.[23] If Mr. GH was concerned about the contents of the unsworn statement, trial defense counsel had several months prior to the court-martial in which they could have proposed modifications to Appellant's drafts. None of the concerns raised by Mr. GH at the *DuBay* hearing were complicated and all could have been addressed well before the court-martial recessed in order to facilitate a government interview of the Defense's sole proposed sentencing witness. We find Mr. GH's concern about Appellant discussing his own childhood victimization inscrutable given the fact the Defense submitted a letter from a counselor going into far more detail about the abuse than the brief mention Appellant proposed. Similarly, if Mr. GH was concerned about Appellant's ability to present the unsworn statement orally given Appellant's emotional state, there is no indication Mr. GH even considered—let alone discussed with Appellant—the option of submitting the statement in a written format or having trial defense counsel read it to the military judge. We further see little explanation for not revisiting the unsworn statement option with Appellant after the Defense chose not to present expert testimony, a decision which sharply reduced the scope of the Defense's sentencing case. Our superior court has described the right to provide an unsworn statement during presenting proceedings as "valuable," and we agree—cases

---

[23] Appellant testified at the *DuBay* hearing that Mr. GH had "zero involvement" in preparing the unsworn statement and that Mr. GH provided no advice regarding giving an unsworn statement prior to the court-martial. Mr. GH testified he had received a draft of the statement at some point, but did not believe he "weighed in on any of it" because he "didn't see any sort of major landmines" in the statement.

that come before us where no such statement has been presented are exceedingly rare, reinforcing the notion that servicemembers almost never forgo the opportunity. Appellant's case strikes us as lacking both the deliberation due in giving up such an important right and the pretrial preparation that would have avoided the last-minute abandonment of that right.

We need not definitively determine whether Appellant's counsel were ineffective, because Appellant has not shown he was prejudiced. Having considered the matters Appellant proposed to raise, we conclude it is entirely unlikely they would have resulted in a lower sentence. The Government's sentencing case was far from robust—consisting only of a personal data sheet, an enlisted performance report, and a letter of counseling for deviating from an assigned task. Appellant's childhood sexual abuse was made clear to the military judge through the letter from Appellant's counselor, and the passing statement about the abuse in the proposed unsworn statement did not provide any further detail on that point. We also conclude Appellant's stated affinity for the Air Force was unlikely to move the military judge to provide a lesser sentence given the severity of Appellant's offense. While we may be skeptical of trial defense counsel's tactics related to the unsworn statement, Appellant has failed to demonstrate the likelihood of a different outcome had his counsel charted a different course. As a result, no relief is warranted.

## E. Timeliness of Appellate Review

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (first citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); and then citing *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Appellant's case was docketed with the court on 9 February 2021, and we are issuing our opinion nearly 24 months later.

Because there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) an appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (first citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); and then citing *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to

"adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

As to the first factor—the length of the delay—the appellate review of Appellant's case has exceeded the *Moreno* standard of 18 months by nearly six months, weighing in Appellant's favor.

With respect to the reasons for the delay, Appellant's record of trial was docketed with this court on 9 February 2021. Appellant filed his assignments of error brief on 5 January 2022, nearly eleven months later, after obtaining eight enlargements of time—all over government objection. The Government filed its answer just over a month later on 9 February 2022, and Appellant filed a reply brief on 10 March 2022 after an unobjected-to request for an enlargement of time. Just over two weeks later, on 25 March 2022, we ordered a *DuBay* hearing to make findings of fact related to the assistance and advice Appellant received regarding his unsworn statement rights. We directed the findings of fact be returned to this court no later than 22 April 2022, although we granted the military judge authority to grant continuances to facilitate the hearing. This hearing did not take place until 26 July 2022—four months after we directed the hearing. The military judge completed his findings of fact on 1 August 2022, but the record of the hearing was not returned to this court for another four-and-a-half months, on 16 December 2022, apparently due to the Government's inability to obtain a timely transcript of the one-day proceeding. Upon our review of the record, we determined the record did not include the findings of fact, and we issued an order on 22 December 2022 directing the Government to show cause why we should not return the record due to the omission. Later that same day, the Government made a motion to attach the findings of fact to the record. After receiving no objection from Appellant, we granted the Government's motion. In sum, the Government took nearly nine months to complete a relatively straightforward post-trial hearing. Four months passed between our order and the military judge completing his findings of fact, but even more time passed afterwards to complete the administrative tasks of transcribing the proceedings and compiling the record. Even then, the record we received was missing the one document we had ordered in the first place. The responsibility for the lion's share of the time between Appellant filing his reply brief and the issuance of our opinion lies squarely at the Government's feet.

Appellant did invoke his right to speedy appellate review, but he only did so on 27 October 2022, more than two years after his court-martial. Nonetheless, this factor weighs in Appellant's favor. We note that once Appellant invoked his right, only two more months passed before the completed record was returned to this court, and we are issuing our opinion one month later.

In terms of prejudice arising from post-trial processing delay, we note *Moreno* identified three types: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citation omitted). Because Appellant has not prevailed on the substantive grounds of his appeal, he has not suffered oppressive incarceration. *Id.* at 139 (citation omitted). Similarly, because we are upholding his conviction to a consolidated specification, his ability to present a defense at a rehearing is not impaired. *See id.* at 140–41. Furthermore, Appellant has not alleged any "particularized anxiety or concern that is distinguishable from the normal anxiety experienced" by an appellant awaiting an appellate decision. *See id.* at 140. Accordingly, this factor weighs against Appellant. *See Toohey*, 63 M.J. at 361. We do not find the delay is so severe that it would lead the public to have a negative perception of the military justice system. Therefore, we do not find a due process error warranting relief.

Recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), and the particular facts presented by Appellant's case, we conclude it is not. We do not condone the amount of time taken to conduct the post-trial hearing in this case, but we likewise do not perceive institutional neglect concerning timely post-trial processing based on the record presented here.

### III. CONCLUSION

Specifications 1, 2, and 3 of the Charge are consolidated into a single specification in place of Specification 1, as set out in this opinion. Specifications 2 and 3 are **DISMISSED WITH PREJUDICE**. The findings, as modified, and sentence as entered and reassessed are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings, as modified, and sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

31